UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

|                             |                              |
| UNITED STATES OF AMERICA,    | ) CR19-159-RSL                |
|                             | )                            |
|           Plaintiff,         | ) SEATTLE, WASHINGTON         |
|                             | )                            |
| v.                          | ) October 4, 2022             |
|                             | )                            |
| PAIGE A. THOMPSON,           | ) 10:00 a.m.                  |
|                             | )                            |
|           Defendant.         | ) Sentencing Hearing          |

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT S. LASNIK
UNITED STATES DISTRICT JUDGE

_____


APPEARANCES:

 For the Plaintiff:     Andrew Friedman
                        Jessica Manca
                        Tania Culbertson
                        Assistant United States Attorneys
                        700 Stewart Street
                        Suite 5220
                        Seattle, WA 98101


 For the Defendant:     Mohammad Hamoudi
                        Federal Defender's Office
                        1601 5th Avenue
                        Suite 700
                        Seattle, WA 98101

                        Brian E. Klein
                        Waymaker LLP
                        515 S. Flower Street
                        Suite 3500
                        Los Angeles, CA 90071

THE CLERK:  We are here for sentencing in the matter of the United States versus Paige A. Thompson, Cause No. CR19-159, assigned to this court.  If counsel could please rise and make your appearances for the record.

MR. FRIEDMAN:  Good morning, Your Honor, Andrew Friedman, Jessica Manca, and Tania Culbertson for the United States.  And with us is Special Agent Joe Martini.

THE COURT:  Thanks, Mr. Friedman.  Welcome, Ms. Manca, Ms. Culbertson and Mr. Martini.

MR. HAMOUDI:  Good morning, Your Honor.  Mohammed Hamoudi and Brian Klein on behalf of Paige Thompson.  At the end of the table is Amelia Whaley from U.S. Probation.

THE COURT:  Thank you very much.  Welcome to Mr. Hamoudi, Mr. Klein, Ms. Meister in the front row.  Is Ms. Tenney here?  Oh, there she is.  Great.

And I understand Mr. Sanders has jumped ship?

MR. HAMOUDI:  Yes.  But he's decided to come in this morning.  He's in the back.

THE COURT:  But he's just another Pacifica lawyer now.  Great firm.

They end up in interesting places.  Ms. Culbertson.  And U.S. Attorney, Nick Brown.  But it's an interesting law firm.

Okay.  There's more of the office coming in, right?  Are you having a staff meeting afterwards, or -- no?  That's not what it is.  Okay.

We're here for sentencing on the jury's verdicts of guilty as to Counts 1, 2, 4, 5, 6, 7, 8.  Correct?  Yes.

And I have reviewed so much in preparation for the sentencing today.  Superb presentation by the government. Superb presentation by Ms. Thompson's lawyers.

And I just want to start by saying a couple things.  But first I should say, Mr. Hamoudi, have you had an opportunity to go over the government reports with Ms. Thompson and make any additions or corrections?

MR. HAMOUDI:  We have, Your Honor.

THE COURT:  Great.  And I know you have a couple of issues that you disagree on.  And I'll discuss those with Ms. Whaley and make our decision.

And, Ms. Thompson, are you ready to proceed to sentencing today?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  There was a motion to -- for a new trial, based on a U.S. Supreme Court case that came out shortly after the jury returned its verdict here.  And I'm going to deny that motion.  And I'm issuing a written order to that effect later today or tomorrow.

But I think that this is such an important sentencing that I want to give it a theme, if you will.  And my theme is that, "The arc of the moral universe is long, but it bends towards justice."  Of course this is a very famous quote from

Dr. Martin Luther King.  And it occurred to me in my -- I find it hard to admit it -- but my 45 years in the justice system, from when I was a summer intern in the King County Prosecutor's Office.  I'm a New York City kid, came out here, went to law school, got hired by the King County prosecutor, sent to AUKEEN District Court in the summer, after my second year of law school.  AUKEEN is the first two letters of Auburn, Kent and Enumclaw.  And that was the district court in those days.

District court in those days was not a court of record. No court reporter.  No tapes.  You just did a trial.  If the defendant didn't like the result, they could appeal and get a whole new trial in superior court.

So I'm sent out there as a baby prosecutor.  And the very first case I get is 17 cattle trespassing on the neighbor's property.  Now, as a kid from New York City, that was all new to me.  But I learned so much being out in the district court.

And then, of course, I have my years in the King County Prosecutor's Office, state court judge, and then since 1998, federal court judge.

And I think about how the system has changed so much in those years.  Agent Martini, the FBI was known to local law enforcement as the "fan belt inspectors."  That's how low they were regarded by Seattle Police, and others, because

they were perceived as being totally aloof from real law enforcement. That's changed so much now with task forces. And we see people such as Agent Ho, Agent Martini, who may have never been in the old FBI.

The U.S. Attorney's Office, in 45 years, we've gone from only white men as U.S. Attorney, to a number of women, and now the first United States Attorney who is an African-American, the first person of color, in Nick Brown. And he epitomizes the office's philosophy that our job is not just to get convictions, but to see that justice is done.

And the three assistant attorneys here today, Andrew Friedman, Jessica Manca, and Tania Culbertson, epitomize that, in the way they handled this case with great care and sensitivity, to the defense, and to all the witnesses involved, to the court. And I'm so proud of them.

On the other side we have not just the federal defenders, who worked so hard, Mr. Hamoudi, Ms. Tenney, Mr. Sanders, and the support staff that helped so much; but we have, in addition, Brian Klein and Melissa Meister, whose firm is a nationally known firm to handle cyber cases, computer cases, et cetera, et cetera.

Mr. Klein represented Frances Haugen, the Facebook whistleblower, when she testified before Congress. And that firm, which charges appropriately high hourly rates, took on this case for free, to help Ms. Thompson, and to help the

federal defender.

The arc of the moral universe is long, but it bends towards justice.

Now, I should also point out that the court benefits greatly by not just having quality lawyers out there, but I have a brilliant law clerk, in Laura Daugherty here. And this is her last week. She will be departing on Friday to go back to a firm in New York, Clearly Gottlieb, where I plucked her from. She had externed for me about five years ago. And I reached out to her and said: Hey, Laura, would you like to come back and be my law clerk? She didn't apply, I just asked for her. And she came back and did a year here.

And for those of you who think I'm just exaggerating how brilliant these law clerks are, Ms. Meister clerked for Judge Canby on the Ninth Circuit; Ms. Culbertson was a career law clerk to Judge Tallman on the Ninth Circuit; Ms. Manca was a law clerk to Judge Mosman in Portland, in the District of Oregon. And I'm proud to say one of my former law clerks, Abha Khanna, this morning argued in the U.S. Supreme Court on the Alabama voting rights case.

So when I say brilliant law clerks, I'm not exaggerating. And I'm not -- I haven't checked to see, it's hard with masks, whether Sara Moorehead is here, or not, but another one of my former law clerks, who is now clerking for Judge Lauren King.

And, you know, Victoria Ericksen, under very difficult circumstances, my courtroom deputy, handled that jury trial, without missing a beat.  Those jurors were shepherded up and down the staircases, and over to other courtrooms, and we had to deal with COVID and all that.  And she's just amazing, and we're so fortunate to have her as part of the court.  And I'm personally so grateful to her.  Our court reporters worked so hard.

Then when we get to this point -- I should also say something about the jurors.  They were incredible.  We picked three alternates.  They were there every day.  Totally paid attention.  We didn't lose a single juror to either COVID, or anything else.

When I went back to speak to the jurors after the verdict, you know, they were so emotional about what they had gone through, and so worried about what was going to happen to Ms. Thompson.  But they did their jobs.  And I said, if you want to come to the sentencing, please do.  I don't know if any are out there or not.  But they're watching and definitely paying attention to what happens.

Now, when I first started as a district court judge in 1998, the U.S. Probation and the U.S. Pretrial Services were separate units.  And, frankly, the probation department was almost exclusively white male; and they considered themselves an extension of law enforcement.  Pretrial Services had more

diversity in gender and race, but they were also considered by the U.S. Attorney's Office, just a bunch of social workers.  And the two were not on the same page.

When I was Chief Judge, I asked the court to consider combining the two units into one.  And we did.  We hired Connie Smith to take over as the head of the combined two units.  She had been in charge of Pretrial Services.  And as her husband observed, "It takes one good woman to replace two good men."  And she was able to take over as chief of both Probation and Pretrial Services.

And merging those units, I think, helped produce better results; because they rotated.  People would work in pretrial, then they would go to sentencing.  And then they would go to supervision.  And it gave us more diversity, but also more coherence in how we approach things.

The arc of the moral universe is long, but it bends towards justice.

And I'm telling you that we could not have had a better Pretrial Services officer than Ben Beetham.  And we could not have had a more qualified and intelligent, and just great probation officer, than Amelia Whaley, who, by the way, is an attorney also, but chose to go into this end of things.  So thereto, it's just amazing to see the change, and the change has all been good.

And Amelia and Ben's boss, Monique Neal, and the assistant

chief, Mike Markham, also reflect that progressive approach to justice.

Now, on the U.S. District Court, I don't want to shock anybody when I tell you I'm actually 71 years old, and have been on the court since 1998. Now, when I joined this court, I took the position held by Carolyn Dimmick. Judge Dimmick was the very first woman on the Washington Supreme Court appointed by Governor John Spellman in the early 1980s. Okay? Now how many women are on the Washington State Supreme Court? I think it's like six or so.

But Judge Dimmick was a trailblazer in those areas. And when I took over for her, I felt the weight of following in the footsteps of somebody who was a unique person, a great judge, and a wonderful individual.

And now with myself on senior status, the position has gone to Lauren King, who is the first Native-American judge, federal judge, in the northwest. And we just watched the arc of the moral universe bend towards justice.

My mentor judge, when I became a U.S. District Court Judge, was Bill Dwyer, who unfortunately passed away 21 years ago, but was a real giant in the bar and the bench in the Seattle area. And he taught me so much, that I use every day as a judge.

So I'm using this as a way of introducing the fact that we have a very difficult and challenging sentencing this

morning.  And every single person who has weighed in on this case, has done so with integrity, with a sense of justice in mind, and has done a remarkable job of advocating for their positions.

And the work of Agent Martini, Agent Ho, and others, in bringing this case, is great.  The prosecution was skillful, steady, and got the guilty verdicts on almost all of the counts.

The defense had to juggle the two things at the same time, the legal arguments, which are over here, and then what's best for my client, how do I help my client survive this ordeal?  And I don't mean "ordeal," just being in federal court, I mean the ordeal of having all this negative attention on her, and her lifestyle, and nitpicking any text message she ever sent, or anything she mused about on a website.

Just imagine somebody going through everything that you wrote down or thought out loud.  And they managed to do that with great dignity and great purpose.  So I'm very hopeful that people look at this and say:  This is the system at its finest, and this is a system where reasonable people may disagree about what the result is, but it was done with great integrity, great dignity, and great concern for justice.

So I extend my real appreciation to all the lawyers for what they did, and all the staff people, law enforcement,

probation, et cetera, for what they did in this case.

Now, we'll get to the nitty-gritty of what the right result is, and I'll start with Mr. Friedman.

MR. FRIEDMAN:  Thank you, Your Honor.

Good morning, Your Honor.  Before I get to the government's sentencing recommendation, there were a few things I wanted to talk about.

THE COURT:  Sure.

MR. FRIEDMAN:  The first is forfeiture.  As the court is aware, we provided notice that we would seek forfeiture in the indictment.  We introduced evidence at trial supporting the forfeiture of proceeds of cryptojacking, and of two devices.  And after the jury returned its verdict, the parties agreed, or the defense agreed it didn't require the jury to make a finding on forfeiture, this would defer to the court.  And we provided the court a combined order of forfeiture, and preliminary order of forfeiture, ordering a money judgment in the amount of, I believe, $10,014, and preliminary forfeiture of two computers.

Forfeiture has to be pronounced at sentencing, so we would ask the court to enter that order, and pronounce that forfeiture as part of its judgment today.

THE COURT:  And I'll give Mr. Hamoudi a chance to address that later, to see if they have a problem with it. But I have to have it today; I get that.

MR. FRIEDMAN:  Thank you, Your Honor.

The second thing is restitution.  Only one victim in this case has provided specific figures and asked for the court to enter an order of restitution.  That is Capital One.  And we attached a declaration setting forth amounts of losses attributable to Ms. Thompson's conduct, from Capital One.  It was filed under seal, but it's a declaration of David Watts, a Capital One employee, laying out various amounts.

We offer, just so the court knows -- because the defense memo talks about the fact that, well, it's just a declaration and it doesn't provide as much evidence as we might want -- we offered, Capital One offered and we facilitated offering Mr. Watts to fly out, if the defense wanted him to testify, wanted to cross examine or elicit that detail.  And the defense chose not to do that.  So the court has his declaration, and at least an implicit suggestion that that's the evidence the defense wants.  They had the right to confront him.

Based on that, we would ask the court to enter an order for restitution in the total of the amount set forth in that declaration.  And when I added them up -- this is going to seem a little, I guess, beside the point, because Ms. Thompson doesn't have that amount of money, and probably won't -- but it totals $230,745,000.

It is important that the court enter restitution

ultimately, because one day Ms. Thompson might earn a lot of money.  She might sell her rights to someone who wanted to write a book or make a movie about this, and therefore profit from it.  If that should happen, the money, of course, should go to the victims.

So if the court addresses that today, we would ask you to enter that order.  And we have no objection if the defense wants to set this out for a restitution hearing to challenge it more fully, that is fine with us.  And it could be done at that time.  But that is the total amount set forth in that judgment and it is all attributable to Ms. Thompson.

THE COURT:  Sure.  Then in terms of restitution versus total loss, for the guidelines, is that number different or the same?

MR. FRIEDMAN:  Well, it's sort of the same -- the next thing I was going to address was the guidelines.  There are two issues.  One is loss amount, so let me address that. The probation office is recommending that the court find that the loss was more than $25 million, which is one of the thresholds in the guidelines.  We have said that that's fine, that we would support that calculation.

We believe it's actually higher and the civil judgment should apply.  But the guidelines are so high that it doesn't matter.  So rather than having the issue, we're recommending the calculation provided by the probation office.

THE COURT:  Okay.  So you agree to the 37, based on loss amount.  Now we'll go to acceptance of responsibility.

MR. FRIEDMAN:  Correct.  And if I could make one comment on that, on these loss amounts.  There's a special rule in the guidelines commentary that provides -- there's the general definition of what losses count, as reasonably foreseeable losses attributable to conduct.

There's a special rule in the commentary that we cited in our brief that says, in the case of 1030 cases, the loss doesn't need to be foreseeable in responding to the crime.  We believe that all of these amounts fall within that rule.  So we think they are foreseeable.  They would be counted that way.  But even if the court didn't want to address that issue, they count as costs of responding.  So we believe that's the correct calculation.

The second guidelines issue, as the court alluded to, is acceptance of responsibility.  And the defense has argued that just because you go to trial, perhaps to defend a legal theory, doesn't mean you're not entitled to acceptance of responsibility.  And the government agrees, there are cases that say that, and that is a legal principle in an appropriate case.

This is not that case.  Because the test of whether you get it, normally through a plea, but even if you go to trial, is whether the defendant has demonstrated true contrition for

their actions.  And one of the things the guidelines say is you look to the comments, earlier comments often as one of the prime sources of that.

In this case, when we look to Ms. Thompson's texts, her posts at the time of the crimes, certainly no contrition.  There's taunting of victims, blaming victims.  When we look through the course of the litigation, she allowed her lawyers to blame victims.  There is nowhere in the record, any sign of actual contrition.  Ms. Thomas -- Thompson hasn't written a letter.  I apologize for saying "Thomas," Your Honor, right before this case I tried a case against two defendants named Thomas.  So sometimes I flip back and forth.

THE COURT:  Sure.  Go ahead.

MR. FRIEDMAN:  But there is no letter to the court expressing contrition.  The defense sentencing memorandum doesn't express contrition.  The comments from the probation office don't -- in fact, they assert that Ms. Thompson is innocent, not waiving her rights.  There is no -- the only suggestion of contrition anywhere in the pleadings, on the part of Ms. Thompson, is a statement that, "I said some stupid things and I'm sorry about what I said."  That's not contrition.  The things she's sorry about is that she said things that got her caught, or that provided evidence that got her convicted.

THE COURT:  What about the fact that she came in and

spoke to you and the agents about what she did, how she did it, and did that in a voluntary way?

MR. FRIEDMAN:  It is true there was a proffer a week to two weeks after Ms. Thompson's arrest.  We haven't mentioned that previously, because it's protected by a proffer agreement.  So now that the defense mentioned it, I feel we can respond to it.  During that proffer she gave what we believe are truthful statements about what had happened. But there was no contrition in there.  There wasn't, "I'm sorry I did it."  There wasn't any heartfelt regret for what she had done.

There was a factual statement that did have some value in terms of helping to figure out a little what she had done, and sharing the information with Amazon.  But there's not contrition in any way.

THE COURT:  Okay.

MR. FRIEDMAN:  So we believe on this record, Your Honor, that there is no evidence of contrition.  There are no facts that would support an adjustment for acceptance of responsibility.

And when I talk about a recommendation, I'm going to talk about some other facts about conduct that occurred on supervision, that I think supports the conclusion that Ms. Thompson is not actually contrite, or deserving of that adjustment.

And so, in sum, we believe that the probation office, the presentence report calculated the guidelines correctly, or provide a calculation in support, and that the total offense level is right.  And the sentencing range in this case is 210 to 262 months.

If the court has no questions, I'll move to our recommendation.

THE COURT:  Sure.

MR. FRIEDMAN:  Your Honor, as the court knows, the government is recommending a sentence of seven years of imprisonment in this case.  That's approximately a third of the range recommended by the guidelines.  But we believe it's an appropriate sentence.  And we believe it's appropriate that the sentence -- it's necessary that the sentence in this case include a significant term of imprisonment, rather than alternative confinement.

And the reasons for that are -- many are set forth in our sentencing memorandum.  But when you look at the factors set forth in Section 3553(a), they support that sentence.  They require that sentence.

The first is the nature and circumstances of the crime.  And Ms. Thompson in this case is responsible for a massive computer hack, computer intrusion, and data theft.  As the court knows from the evidence, she scanned or probed computers belonging to 37 million different entities.  She

succeeded in getting into some of those. She got credentials for at least 200 of those. She stole data from at least 30 of those entities, in some cases massive data, and sensitive data. That data included the PII of 100 million people. At the time that it occurred, and this may still be the case, looking just at that measure, this was the second largest data breach in U.S. history. So this was a massive crime.

It had a huge impact. The first and most obvious impact is the impact on Capital One, the financial impact. And the court has seen Mr. Watts' affidavit, which lays out approximately $230 million of costs attributable to this. Mr. Watts actually says it's more than $250 million, because there are legal fees which Capital One did not disclose, and they're not asking for restitution.

But we're talking about a quarter of a billion dollars of financial damage to Capital One. And that's a hard number to conceive of. I mean, we don't think of $250 million. And it doesn't pop up in your mind easily. But it's a real cost. And it's a real cost, even though it was incurred by a corporation, because it doesn't just fall on the corporation. It's spread out. It falls ultimately on customers who end up paying more, because the corporation's charges go up. It falls on individual shareholders.

It's diffused in a lot of different ways. But it is a destruction of $250 million of value. So a huge financial

impact.

And when I was trying to envision that, when I was trying to think about what $250 million looks like, I sort of thought of a different arena, and I thought of organizations, I guess, in the public sphere. And I looked up the budgets for Oxfam America. This is more than double the annual budget of Oxfam America. It's more than half the annual budget of the Peace Corp. So it is an amount of money, when aggregated back together, could do tremendous social good. And Ms. Thompson's actions basically destroyed that amount of value.

They also didn't have just a financial impact. They impacted people. And the court heard from some of those people. I mean, employees at companies who were forced to spend substantial amounts of time, energy, under strain, dealing with this. I think Mr. Fisk from Capital One testified that when he heard of the breach, he went into the office, and he and a lot of people didn't come out for a long time; for weeks.

So people were working around the clock to deal with -- to try and figure out what the damage was, to contain it, to respond to it.

And it wasn't just Capital One, Michigan State University spent a lot of time looking. And I think they submitted a statement. They spent a lot of time trying to figure out

what information had been taken.  And as it turns out, it wasn't, in their case, significant, because it was public information; but that was just by chance.  Because, remember, Ms. Thompson was just taking whatever was open, whatever she could get.  And they pointed out, it could have been healthcare information.  It could have been really important or critical information that was taken.  In their case it wasn't.  In Capital One's, it was.

So you had this information that was taken and people having to go to great lengths, under great stress, to deal with it.

You also had the people whose information was taken.  Now, in this case Ms. Thompson did not monetize or use that hundred million people's information.  She looked at doing it.  She conducted research about doing it.  She did actually use one individual Joy Bladeth's (phonetic) information, probably for a relatively limited purpose.

But even though she did not basically sell that information, even those people didn't then suffer credit card fraud, a non-trivial percentage of them were -- they received notices from Capital One.  They ended up joining lawsuits.  They experienced the strain and frustration that people do when they are told your PII has been stolen.  So they were concerned.  Yes, they weren't victims who had out-of-pocket losses, but they suffered strain and anguish because of this.

So there were that kind of victims also.

And then -- and we don't know if this was just by chance or if it was somehow by design -- but a significant percentage of the victims we were able to identify were companies that were involved in the computer security business.  And for those victims, this breach was particularly harmful, because they build their reputation, they build their business on the fact that they secure data.

And it was embarrassing for them that they, themselves, had been victims of a breach.  They got questions from customers.  They were worried that it would sink their businesses.  They were often very unwilling to provide information to the government, or to cooperate with our investigation.  We had unanswered phone calls, unanswered e-mails.  Statements like:  Oh, we can't help you.

Even the victims that did help at trial, and a number of them testified, as the court will remember, generally, basically said:  We've done our duty, we're done.  The board thinks this is not good for us.  We want to be done with this.  And you have a memo summarizing a conversation with one of the victims saying that.

THE COURT:  Um-hum.

MR. FRIEDMAN:  So this conduct wasn't really -- it wasn't just an academic breach -- that's sort of the wrong phrase -- but it is something that impacted a lot of people.

THE COURT:  Sure.  But let me ask you, Mr. Friedman, let's just say, if Ms. Thompson had done the right thing --

MR. FRIEDMAN:  Yes.

THE COURT:  -- and notified AWS and/or Capital One, you've got a big problem, wouldn't they have had to expend a certain amount of money just to solve the problem?

MR. FRIEDMAN:  I think if Ms. Thompson had notified -- let's just take Capital One as the example.  If she had notified Capital One that:  Hey, I can access your credentials and take them, and could do this.  I haven't taken any data.  Someone would look at that.  I'm sure software engineers would spend a couple days on it.  Capital One would say, yeah, this is a problem.  We need to change the configuration of the firewall.  But that's going to be a few days -- a few days' work for a couple people.  It's going to be very different from -- they're not going to have to make a notification to states.  They're not going to notify customers.  They didn't have data stolen.

So there would have been an issue to deal with, but I think it is an issue that could have been dealt with incurring thousands or tens of thousands of dollars, and only a few people's time.

THE COURT:  But they had no way of knowing if Ms. Thompson was the only one that got in.  They would still have to do some research to see if, oh, my gosh, we better

tell our regulators that we have an issue, right?

MR. FRIEDMAN:  They are constantly finding possible vulnerabilities and fixing them.  So I can't tell you exactly what their responsibility would be.  If they found a vulnerability, it would be to fix it.  It might be they're telling the regulators.  But it would be on an entirely different scale than what happened here.  And it would also be much more akin -- I mean, they have a responsibility disclosure program.  They receive disclosures all the time.  It would have been handled at that level, and consistent with that.  And so an insignificant fraction of the harm that occurred in this case, I believe.

THE COURT:  Okay.

MR. FRIEDMAN:  And, Your Honor, I'm going to digress for a second, if I can, to address one other point that's raised by the court's question.

There's a note, if the court will remember, that is handed to someone at Amazon at a conference, I believe in Bellevue.  And the court heard motions about that and saw the actual note.  And we investigated.  I think this was in the pleadings.  And we were never able to figure out the details of that note, because it was handed to someone at Amazon, who handed it to the executive from Amazon who testified.  He can't remember who handed it to him.  So we can't figure out who that person was to say who handed it to them.

So there's been some suggestion during the case, by the defense, this is Ms. Thompson trying to disclose.  And I would ask the court to discount that suggestion.  There's no reason to think it was Ms. Thompson.  There's no evidence it was Ms. Thompson.  If Ms. Thompson had actually done it, I would expect we would had have a statement from her saying, yes, I did that, in some way.

And also, from Ms. Thompson's perspective, this was not a Capital One breach.  This was an Amazon weakness that allowed her to breach hundreds of companies.  So if she were making a disclosure, it wouldn't be a disclosure to Capital One, it would be a disclosure to Amazon that was more systemic.

And so that -- the explanation that this is Ms. Thompson deliberately trying to disclose.  It doesn't make sense. What does make a little more sense is that she had bragged to someone about Capital One on maybe one of the posts or texts we saw -- the vulnerability had been exposed, and someone else figured out she has access to Capital One, and that person might disclose it as a Capital One breach.  But Ms. Thompson wouldn't have done that.  And there isn't any evidence to suggest she did.

THE COURT:  I'm going to leave that as an unproven fact, one way or another.  I'm not going to say she did it or didn't do it.  But I understand your analysis of why it was unlikely to be her.

MR. FRIEDMAN:  So, Your Honor, as I address the 3553(a) factors, I've talked a little bit about the seriousness of the crime, the scope of the crime, and its impact.

A second factor is Ms. Thompson's history and characteristics.  And I want to talk about those.  We're going to talk about a couple different kinds.  But I'm going to talk about those in the context of this crime, of what she did here, and of her conduct since then.

And as the court knows, the court saw the social-media posts, the texts.  Ms. Thompson bragged about what she was doing at the time.  She posted -- she made posts, she claimed that she had stolen information from people.  She used the word "jacked."  She mocked victims saying it was their fault, or they were stupid.

And she knew that it was wrong.  I mean, the texts contain references to going to jail, to wire fraud, which is actually pretty specific for someone to know when they're doing this.  That wouldn't be the first thing you jump to.  So Ms. Thompson was aware that what she was doing was wrong.  It wasn't white-hat hacking.  It was stealing information for her own purposes.

Ms. Thompson also shared what she was doing with others.  And the court will remember one of the communications that said that someone else, a different person she was talking

to, could use her scripts, "To do some shit with AWS.  Go for it."  I'm sorry, "To do some stuff with AWS.  Go for it. It's not my shit.  LOL."  So she knew what she was doing was wrong.  She kept doing it, and encouraged others to do it.

When she was caught, she chose to go to trial.  And that's her right.  I mean, everyone has the right to go to trial. But that didn't just cost government resources, it continued to inflict harm on the victims, the victims that didn't want it publicized that they had been breached, for whom it was harmful they had been breached.

And she went to trial basically with a false narrative. She continued to claim and claim through her lawyers, that this was the victims' fault, not hers.  That it was their failure to configure systems properly that had caused that. Even though, notwithstanding that failure, she was still committing a crime.  And she knew that she was committing that crime.

The court will remember Mike Fisk from Capital One testified that Capital One goes to great lengths to protect its information.  I think he testified that the budget for computer security for Capital One was approximately $200 million a year.  And he talked about all the different methods that they used, and different checks, and ways to try to stop people from intruding.

Now, it's true Ms. Thompson found a way through that

security.  But the reason for that is not that Capital One was not trying to protect that information; it's that you cannot make a system impenetrable.  There will always be a way to get in.  And so computer security is about trying, as best you can, to make the system as protected as you can. But it's not going to be impenetrable.

And that doesn't mean it's Capital One or any other company's fault.  It's still Ms. Thompson's fault.  If a burglar goes to every house in the city and doesn't go to the front door, he goes to the back, the basement window, and checks it, and finds one that is open, and goes in and burgles the house.  Yeah, the homeowner could have locked that, but it's still the burglar's fault; and that's the case here.

And Ms. Thompson knew that.  She knew that when she was doing it.  She said that when she was doing it.  And the fact that -- I said obviously you have the right to go to trial. But I think it's significant what the defense was in this case.  The court will remember that the defense chose not to ask for, or to provide expert disclosure; and that was because they wanted to shield what their expert would say.

And we really didn't figure that out until their expert -- I guess maybe the morning of testimony when we received his exhibits, and until he got on the stand and testified.  And so it was basically a surprise defense that, well,

Ms. Thompson might have thought this was illegal, she might have thought she was stealing information, but, wait, actually technically it was okay.

And I would suggest to the court that the way that that defense was presented, suggests or confirms that Ms. Thompson knew this wasn't okay.  If you thought it was okay you explain it earlier on, you don't spring it, hoping that springing it without notice will convince the jury, or at least hang the jury.

I said this prosecution was based on kind of a narrative that was not consistent with what Ms. Thompson -- the defense was based on a narrative that was not consistent with what Ms. Thompson knew about what she was doing.

There's also another troubling aspect, if the court will remember, there was the suggestion in a number of pleadings that Ms. Thompson was prosecuted only because she was a transgender woman, that this wouldn't have happened if that were not the case.  And I think the court knows, but I can assure the court, if anyone did this breach, it doesn't matter who they are, sex doesn't matter, gender doesn't matter, if someone committed a breach like this, they would be prosecuted for this breach.

THE COURT:  I have no doubt about that.  And, you know, in some of my orders I rejected any kind of bias or untoward motives on the part of the prosecution.

MR. FRIEDMAN:  Thank you.

THE COURT:  This was a case that had to be prosecuted.  And the defense said it was a case that had to go to trial, because it had significant legal issues.  And I wouldn't criticize what the government did, but I don't criticize what the defense did either.

It's not their burden to plead guilty to save the government trouble, or to save the victims embarrassment.  They were trying to do the best they can for their client, and they legitimately saw some decent legal issues that might prevail on appeal.  So I don't criticize what they did either.

MR. FRIEDMAN:  The other thing I think is particularly troubling, or some events that took place following Ms. Thompson's arrest while she was on pretrial and then post-trial release, and we've alluded to those in our sentencing memorandum, but I think it's important to highlight them for the court.

The first has to do with cryptojacking.  As the court is aware, at the time of trial we presented evidence about one wallet that had received about $10,000 worth of cryptocurrency that Ms. Thompson had cashed during the course of the hacking, prior to her arrest.

Late pretrial, Mr. Ho discovered another cryptocurrency wallet on one of Ms. Thompson's devices; the secret key for

that.  And so we shared the information we had with the defense.  But we did not present evidence of that at trial.  But we have made that, and attached a short report of that, and also printed out some public information available to the court.

And what that shows is that probably a week before her arrest, right after a number of Ms. Thompson's cryptocurrency miners were shut down, probably because they had been discovered, Ms. Thompson talked about setting up a different wallet to receive cryptocurrency.  And that -- this new wallet started to receive deposits about a week before Ms. Thompson's arrest.  And it continued receiving deposits while she was in custody.  And the defense has suggested that means, well, it couldn't have been her.  That's not the case, because the cryptocurrency miners that she planted, once they're there, they just keep running automatically, and you keep making money every day.

So the fact that money is coming in while she's in custody, is not inconsistent with it being her.

What happens is after she was released from custody starting in November of 2019, and continuing through the following spring, two things have happened.  One, cryptocurrency is soaring.  So even though there was only a couple thousand dollars deposited into there, the value has increased massively.  And there were starting to be

withdrawals from that.  And Ms. Thompson, it appears, withdrew approximately $40,000 of cryptocurrency during that roughly six-month span while on pretrial release.

And that money did not -- one would expect, if you accepted responsibility, that money would go into a pool, or be kind of made available for restitution for the crime with which you've been charged.  It didn't.  It disappeared.  And I think the fact that she's continuing to benefit from and presumably live on the proceeds of her crime, while on release, is suggestive of someone who is not contrite, someone who is not accepting responsibility.

The second thing is a more recent episode.  A month or two ago Ms. Thompson expressed an interest to her Pretrial Services officer, Ben Beetham, about obtaining employment. And he gave her permission to have online communications that were employment related, or I guess job -- employment-seeking related.

Now, as luck would have it, and the court is aware of this, Ms. Thompson got permission to go to DEF CON, which is a big hacking convention.  And Mr. Ho also went to DEF CON, as part of his job.  And by pure luck, ended up seated on a plane on the way home, trying to listen to his movie, and hearing a loud voice two rows behind him.

The defense suggested Mr. Ho was stalking Ms. Thompson, that he was trying to spy on her, or something.  No, he was

hearing a voice that was loud enough that he couldn't listen to his movie, that he thought he recognized. So, by chance, he was sitting on that plane, hears Ms. Thompson talking, takes out his earplugs, and hears her talking with the person next to her. And she is talking about the fact that she uses IRC, Internet Relay Chat, which is online communication. That she is going to send him an invitation. Talks about using things to game online. Extensive use of different online communication.

We passed that information to Mr. Beetham, because that would be a violation of her conditions of supervision. He asked her about it, and she denied that. We were going to conduct some additional investigations, so he didn't confront her with the evidence. He just asked her if she was doing these things. She denied it. She's not only flouting the conditions the court, through Pretrial Services, imposed on her, she is lying to Pretrial Services when confronted about it. And I think that's also very significant in terms of saying who Ms. Thompson is, what are her -- what are her characteristics.

The defense has also suggested that it's significant that Mr. Beetham didn't file a violation based on that. But it's two weeks before sentencing, so I think a violation at that stage would -- I don't know if we would be doing a violation hearing here -- but it would have no practical consequence.

So it makes total sense he didn't do that. I don't think the court should draw any inference from that.

And second, the defense is suggesting in their sentencing memorandum that's not significant, because all communications online are employment related. If you're playing a game with someone, you're networking. It's their form of employment. I think that's a silly defense. First, Ms. Thompson denied she was doing that. But, second, by that definition the condition you may have employment-related communications would mean nothing.

So I think the only conclusion we can draw there is she was deliberately flouting her conditions and that she deliberately misrepresented, when questioned by Pretrial Services about that. When you look at the claims she made when she was committing this conduct, what she's done on supervision, those all go to and suggest that her history and characteristics are significant, and suggest a significant sentence.

The latter two are particularly important, because there's been a suggestion at times, through this litigation, that Ms. Thompson's hacking was because she was, at that stage, in an unstable situation, or not receiving appropriate treatment; but that she's been doing much better while on supervision. Well, we have these episodes, when she is on supervision, presumably receiving that support, yet conduct

is continuing that is concerning.

I want to address another issue, that obviously has been raised in the pleadings and is important to the court, which is the fact that Ms. Thompson is transgender.  That was certainly on the court's mind at the time that the court released Ms. Thompson on pretrial supervision.  I think it's important to note that we're in a different place now, than we were then.  This is a different administration.  The Bureau of Prisons has revised its policies, substantially.

So first off, Ms. Thompson is not the only transgender individual going through the federal criminal system.  There are just shy of 1,500 transgender inmates in the Bureau of Prisons.  So this is a situation where there are a lot of people that have this issue.

Second, the revised policy is much more liberal and accommodating in terms of saying that the Bureau of Prisons will look at all factors about an inmate.  That there is no pre -- there is no fixed rule of inmates shall go to a certain place, or be designated in a certain way.  They will look at all factors in terms of whether people have had gender-conformation surgery, the length of time that they've been doing things, how they have been living, hormone levels, all kinds of factors like that.

Then the decision about placement is delegated to something called the "transgender executive committee," which

is a committee of high-level individuals, based, I think, in Washington, D.C.

But every placement decision is made by that committee, based on information that they are able to gather, through an extensive review of a case.

We asked is it possible to get a designation before sentencing, because we could tell the court what would happen?  The answer to that is, no, it's a policy matter. Because I think every inmate, people with health issues, everyone would want that designation.  And I think they're not willing to -- I know they're not willing to do that.

But that committee will look at the facts of Ms. Thompson's case.  And so where she is ultimately designated, what kind of institution, is yet to be determined.  But it could be a male, it could be a female institution.  It could be one, and changed to the other.  So it's something BOP is sensitive to.  We don't have certainty about what will happen in this case.

THE COURT:  I was very encouraged to read the Bureau of Prisons was taking that step.

MR. FRIEDMAN:  Thank you, Your Honor.  That also is -- and we said this in the sentencing memo -- that is an important issue, but has to be balanced with other issues. The seriousness of the crime.  The characteristics of the defendant, and all other issues the court looks at.  So we

acknowledge that that's an issue.  It's something we've considered in making our recommendation, but it's something that I think is consistent with our recommendation.

When you combine all of these factors, the government believes that the recommendation we're making is the appropriate recommendation.  I mean, first, it's a massive crime, the second largest data breach in history, that caused massive damage.  It wasn't a mistake; it was deliberate conduct.  Ms. Thompson's own comments show that she knew what she was doing at the time, and that she knew that it was wrong, and she knew she faced going to jail for doing it.

It's important to punish that crime.  It's also important to deter similar crime.  This is a case that has received a lot of attention, and maybe the only case I've worked on in 20 years that's been reported in The New York Times.  It is getting intense scrutiny online.  People are looking at this case.

And what the court does here will have an impact on what other people do.  And I think this is acknowledged in, I believe it's Darren Smith's -- I think it's Smith -- but Exhibit 6 to our sentencing memorandum is a submission by a security researcher, who says that people look -- people deciding whether to hack look at costs and benefits.  And we know that's true.  And that people will look at this.  And the court has to factor that in, or should factor that in,

when it decides the appropriate punishment.

And, Your Honor, the court can say whatever it wants. But the court's actions, not its words, are going to be what gets encapsulated in the quick tweets, what today is remembered for. And if the court gives the sentence, the alternative suggested by probation of home confinement, I would suggest that that is not going to be seen as a serious punishment, or deterrent for this crime. The court needs to give a sentence that is a period of imprisonment and it is a period of imprisonment that others will look at and choose not to engage in similar conduct.

So, Your Honor, that is one of the factors, when we are trying to figure out what number to come out at. The guidelines in this case are obviously very high. And maybe there was a moment of conversation when we said: Do you recommend a guideline sentence? I don't know. But I think very quickly we got to, that's really high, it's probably not appropriate, given the facts of the case, and it's not necessary for deterrence.

But we think that the sentence, certainly the sentence being recommended by probation -- the sentence being recommended by defense, but also the one being recommended by probation, are not high enough to have that deterrent effect. So when you look at Ms. Thompson, at this case, at the need to punish her for this crime, and the need to deter others,

we believe the seven-year sentence we're recommending is the appropriate sentence.

THE COURT:  Thanks very much, Mr. Friedman. Mr. Hamoudi?

MR. HAMOUDI:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. HAMOUDI:  Thank you.  There's a large consensus of support, friends and community members of Ms. Thompson are here.  I won't identify them by name, but they're sitting behind me.

As to the matter of forfeiture and restitution, the government filed a forfeiture motion last night.  We ask that the court give us some time to process it and file something.

THE COURT:  There's no question there will be forfeiture.  But whether it covers the four squares of the document, I'll wait to hear from you.

MR. HAMOUDI:  Thank you, Your Honor.

I'll address the guidelines.

THE COURT:  What about restitution?  You jumped over that.

MR. HAMOUDI:  The same thing with restitution, Your Honor.

THE COURT:  You'd like at least some time to think about:  Are you going to have a hearing?  And if so --

MR. HAMOUDI:  Yeah.

THE COURT:  Okay.  I'll do that.

MR. HAMOUDI:  I want to talk about the guidelines. The government, without any attempt by Ms. Thompson, unilaterally moved to exclude any and all evidence from the Capital One lawsuit.  And this is the numbers figure, the guidelines figure, that is shooting up astronomically.  And in their filings they said that those -- that that lawsuit and the costs and the fines, or whatever associated with it, were completely different than this case.  And they specifically moved us, moved to prohibited us from putting on evidence regarding the details of that lawsuit.

And at trial what we learned was that there was a lot of names and dates of birth that were part of the data breach. But, in fact, there was only 117,000 Social Security numbers. Much of the Social Security numbers were tokenized, meaning they were encrypted.  They were useless.  And we submit that Capital One did not pay a quarter of a billion dollars, over 117,000 Social Security numbers.  But, in fact, what the consent decree demonstrated was that there was problems predating Ms. Thompson's breach.

And they did not hire two very powerful law firms, one to address matters here and address matters in Virginia, simply because of Ms. Thompson's conduct.  And that was the problem is that we didn't get an opportunity to confront that issue.

Now, the government says that they had somebody they

wanted to bring on and testify about Capital One's losses. We did not admit to them that they don't have to bring the person, what we told them is that we're not putting on any witnesses. It is still their burden to establish, by clear and convincing evidence, that the loss amounts are attributable to Ms. Thompson.

As to acceptance of responsibility, the commentary speaks to two issues. One is challenging the constitutionality of the statute, that has been consistent throughout, that we have been challenging the constitutionality of the statute and breach of the statute on constitutional grounds. And the court can award acceptance of responsibility on those grounds.

Separately, Ms. Thompson did make pretrial statements to the government. We went in there and she gave them a technical proffer about what happened. And the government filed pleadings with the court saying that the proffer was helpful. And that information was shared with other companies to remediate the problem.

So we take the position that on those two grounds, she should be given the two points of acceptance of responsibility.

Now, I want to move on to sentencing. And the court talked about the arc of justice. And there are spirits, Your Honor, that have weathered many hardships in life, and

somehow continue with resilience.  Paige is such a spirit.
And the arc of her life shows this.  We ask for a sentence of
time served, three years of supervised release.  She has been
incarcerated for almost 100 days in custody.  She spent
30 days at an RRC.

For three years she's been under restrictive pretrial
conditions, while under the difficulties that all of us
endured in the pandemic.  And, Your Honor, her name has been
maligned.  And there are significant obstacles, as a result
of this case, that have been placed in front of her with
respect to her ability to find a job.

Placing her in custody, Your Honor, will result in her
losing housing, financial stability, and deprive her of the
opportunity to receive effective treatment, effective
treatment in the community, based on the conditions outlined
by both of our experts.

I want to talk about her personal history and
characteristics.  The granting of her pretrial release saved
her from documented physical and mental dangers and harms in
incarceration.  It provided her with an opportunity; and she
seized upon it.  Since then, and I'll quote the court's
officer, Benjamin Beetham.  "She has demonstrated she can be
a law-abiding and productive member of the community."

Ms. Thompson is now in a safe, supportive environment,
surrounded with prosocial individuals who assisted in the

supervision process.  It follows that incarcerating her would place her in an unsafe, unsupportive environment, surrounded by individuals keen on objectifying and marginalizing her. It is not disputed that the Bureau of Prisons does not have the capacity to keep her safe, given her unique vulnerabilities.

Your Honor, Paige is a resilient, compassionate, capable, smart and courageous person.  She was born to a world that was hostile to her, and unsafe for her.  But she said, "I am."  She said, "I am Paige.  I'm not the name you gave me at birth, and I'm not the gender you assigned me at birth." That's courage.

And though she was deprived of much agency in her life, she marshaled through trauma, after trauma, and she kept hope alive.  And that hope was very simple, that one day she, like many, could be a working professional in the tech industry.

And even when she was deprived of that opportunity, to develop this talent as a child, she demonstrated resolve by starting her own company at the age of 13.  She named herself CEO.  She built a community in a virtual world.  She wrote blogs.  She was being herself.

But the tech world, Your Honor, is as Ms. Kat Valentine testified, it's a toxic world for Paige.  She cannot necessarily be herself, talk like herself, and dress like herself, and be treated like an equal.

Diversity is not just about checking the boxes.  Diversity is about fostering and promoting the diverse ways in which persons live, speak, dress and think, about the very thing that the organization is all about.  True diversity also means accommodating those who think and see the world as differently, like Paige does.  This is the unsafe world she grew up in.  This is the unsafe and hostile world that she attempted to thrive in, but could not.

And it is against the backdrop of these circumstances that this case arose.  And when the case was filed, in my 15 years of being a criminal defense lawyer, it was apparent to me that she did not have a vicious will.  Perhaps the best example was when she was incarcerated.  When she was incarcerated in a male prison, under exceptional circumstances, under suicide watch, she offered to help, technically explain what happened in this case.  That, Your Honor, speaks to her character.  She expected nothing, and received nothing for that.

This idea that she should have disclosed sooner.  This isn't a case about disclosing.  This is a case about disclosing on somebody's terms.  Imagine the misapprehension of that premise.  A person that has endured what she has endured personally and professionally, to reach out and say: Here, look what I found.  In 2019.  Would you, in her shoes, feel safe to do that?

I've spoken with her many a times since 2019.  During the pandemic, I would go downtown.  I would take her out to lunch.  She wore the same shoes that Nancy Tenney gave her, all the time, because she didn't have much.  We were raising money to give her a place to stay in.  Our social worker is working around the clock.  Our investigator, Stacey Brownstein, working around the clock.

She always regretted about what she said and how she spoke.  But it's a different world for her, this online world.  And authorization, whether or not she was authorized to do what she was authorized to do, doesn't look to the way she speaks or the way she says things.  And that was our concern.  That was the legal conflict that we had, that against the backdrop of this murky law that we were dealing with -- and we had to go to trial, Your Honor.

And she is different than us.  And she speaks differently, because she has ASD.  She had no idea what she was downloading.  And I can't help but think that what is effectively being said is that if she was more eloquent, like Mr. John Strand or Alex Halderman, our witness, that this case may be different.

To me that's what effectively Ms. Valentine was talking about, which is this toxic thinking about how people ought to behave.  Because there are not real legal standards that govern this world.  There is no legal obligation to disclose.

There are standards of privilege.  There are standards of power, and standards of access.

I do want to address the government's arguments about deterrence, and outline to the court some of the philosophical limitations with those arguments.

Again, as the court itself has acknowledged, that this is a murky area of law; and the case law is continuing to evolve.  The government says, even as she began to realize the full scope of the harm she was causing, she still did not stop hacking computer systems or downloading data.

So I think the argument here is that if she stopped -- or if she did not download data, then her conduct is necessarily authorized.  Well, the point of authorization was -- our understanding -- was when entry was made through the web access firewall.  Once you're behind a firewall, then you're authorized and you can do what you want.  But the law is not clear on this.  That's one of the limitations.

The second thing they say, she did not even delete the data she stole.  Instead, she archived all the data she had stolen by compressing it and moving it to a different volume of her computer, for long-term storage.

The jury acquitted her of what she did with the data.  That was in Counts 9 and 10.  They say, "Considering the broad impact of her crimes and the critical role that the CFAA plays in deterring cybercrime, it is particularly

troubling that Ms. Thompson still does not accept that her conduct was criminal, and still does not express remorse for the harm she caused."

Well, it could also be argued that the broad impact is that Capital One fixed its systems to protect sensitive data. The broad impact is a positive one.  Just last year, Capital One's stock had doubled.  And now, with the economic downturn, it's gone back down.  AWS notified its customers. So there's arguments on both sides.

"She continues to blame the victims for her poor choices. Continues to question whether the jury's verdict was just. Continues to mischaracterize her actions as good-faith security research and trivialize her crimes."

Ms. Thompson did not blame Capital One, she presented evidence that a government institution hold Capital One accountable, and tried to, but could not, put on evidence that consumers also held Capital One accountable. Ultimately, the CFAA plays a murky role in enforcing conduct in this case.  And it's unclear what will be deterred.  If anything, the manner in which the case unfolded, some would say, would deter people in the future from not saying anything, when they realized that a banking institution has failed to protect data, and may promote people to hide their identities and not disclose at all.

I want to close and talk about Paige's future, because it

is an important one.  She wants a job.  She wants an opportunity to thrive as an equal to people in the tech industry.  Nothing more.  Nothing less.  This is what I've learned from her this last three years.  She's talked to me.  She talks to me about ideas.  She has wonderful ideas.  She has remarkable ideas.

She is gifted.  But she just doesn't have the confidence that I have to walk into a courtroom and speak like this.  She doesn't have the ability to relate to people, as most people are capable of doing.  She finds her identity in a virtual world.  She's trying to find her identity in the real world.  One day at a time, with the support of a lot of people.

Putting her in prison, incarcerating her, will not advance any good cause, Your Honor.  That will not bend that arc towards moral justice, it will bend it towards an injustice.

Paige does have some things she wants to say to the court, if the court would allow her.

THE COURT:  Please.  This is the right time.  Yeah.

THE DEFENDANT:  I would like Your Honor to thank Ben Beetham for his support and compassion throughout all of this, as well as you, Your Honor.

And I recently received the official diagnosis of Autistic Spectrum Disorder, which is something I kind of always suspected, but I've never really considered any reason why or

what advantage it would be to have an official diagnosis.  So I'm still kind of exploring what that might be.  And I would like to be gainfully employed again, and contribute something meaningful to the world.  So thank you.

THE COURT:  Okay.  Thanks, Ms. Thompson.

You know, a number of the giants of the tech industry are somewhere along that Autism Spectrum Disorder, too.  It's not an accident that some of those people find the online and the computer world easier to navigate, than the interpersonal world, when you have those issues.

I did kind of expect to get a letter, or some sort of acceptance-of-responsibility-type letter, Mr. Hamoudi.  Did you think that would affect your appeal in some way?

MR. HAMOUDI:  For that reason, but she also wanted to talk to the court, wanted to orally do it.

THE COURT:  Okay.  Thank you, Ms. Thompson.  Did you get to say everything you wanted to say?

THE DEFENDANT:  Thank you, sir.  Thank you, Your Honor.  And I'm very sorry about this.

THE COURT:  All right.

THE DEFENDANT:  Thanks.

THE COURT:  Okay.  So the first issue is acceptance of responsibility.  And I believe that while it may be a close call, I think the minus two for acceptance of responsibility should be applied here.  So I believe the

offense level should be 35.

What's the guideline range for that, Ms. Whaley?

THE PROBATION OFFICER:  The guideline range for 35 is 168 months to 210 months.

THE COURT:  To 210?

THE PROBATION OFFICER:  Yes.

THE COURT:  So that would be the range here.

In regard to the loss amount, I believe the decision of probation is correct.  So those points will stay there.  And it is an offense level 35, with a criminal history category 1, for a guideline range of 168, which is 14 years to 210, which is 17, 18, somewhere in there.

Again, the government would be within its right to recommend a bottom-of-the-guideline range.  But they took a principled and measured approach, to recommend a sentence of 84 months.  And as I said, what's the right answer here?

The right answer is what does the judge think, considering the offense, the guideline range, and the 3553 factors here?  And that's -- you know, as I say, I've been doing this, one way or another, for 45 years.

I had the experience of actually being a lobbyist in Olympia in 1981, for the King County Prosecutor and the Washington Association of Prosecuting Attorneys, in advocating for the passage of what became the Sentencing Reform Act of 1981, which was House Bill 440 at that time.  I

actually got an apartment down there and lobbied day, to day, to day, for a guideline sentencing, because it seemed to me that what we had was not honest.  Because the public would read that somebody got 20 years in prison, but they'd be out in six months on accelerated parole.  And there was a lack of candor, and a lack of honesty in the system.

Now, the same thing was happening on the federal level.  And in the State of Washington we had kind of an interesting duo of a very, very liberal democratic representative, Mary Kay Becker from Whatcom County, who later became a Court of Appeals judge, and Gene Struthers, a very conservative republican from Walla Walla County, who both agreed we need to make sentencing more fair, and more predictable, and more consistent.

On the national level, the liberal democrat was Ted Kennedy from Massachusetts.  And the conservative republican was Strom Thurmond from South Carolina, who don't agree on anything.  But they both agreed the sentencing system was unfair and needed to be improved.

I even had the experience, when I was a Superior Court Judge, of being the chair of the Washington State Guidelines Commission.  I know, there's so much about me that you don't know.  But these were important experiences for me, because there's a lot of disparity from county to county in the State of Washington; and there's a lot of disparity from district

to district, within the United States.

And I've told the story before of how, when I was chief judge, and the federal defender was Tom Hillier, there was a national conference of federal defenders in Seattle, and Tom asked me to speak, to welcome the defenders.  And I did.  And then I sat down, and Tom got up and did one of his famous, "Why I hate the sentencing guidelines," which culminates with him picking up the guidelines manual and firing it against the wall as hard as he could, which woke up anyone who I had put to sleep in the room.

But then there was a break, and I went into the restroom.  And there were a couple of defenders from Alabama and Mississippi who said, "Man, judge, if we didn't have the guidelines to restrain our judges, we'd really be getting long sentences."  So it's emblematic of the fact that sentencing in Seattle is not the same as sentencing in Birmingham; although the guidelines try to make it more similar.

But ultimately, individual United States District Judges are given a great deal of discretion to do justice in individual cases.

And the question of what is justice here is a really, really hard question.  Mr. Friedman is absolutely right, there are some people out there who are looking at the cost-benefit analysis and saying:  Man, if I can get away

with credit for time served of 100 days, with the possibility of making a couple hundred million dollars with this, I'm going to take the chance.  It's not like a crime of passion that happens, when people are not considering those things.  So it's an absolutely appropriate argument for the government to make.

It's also absolutely appropriate for the defense to say, as terrible as the crime was -- they're not conceding -- but I find it was a terrible crime.  The individual was not doing it in the malicious manner that you want to punish, to the same degree as somebody who gets that information and immediately turns to monetizing it in some way.

I believe Paige Thompson was shocked that she got in, as easily as she did.  Not that it was easy, but from her perspective it didn't take that much.  She was tortured and tormented about what she did, and what to do with what she did.  She made some attempts to reach out to Ms. Valentine, to get somebody to help.  But ultimately she was caught before she did anything bad, or anything good.

And so it doesn't argue for sending her to prison.  And it also doesn't argue for not sending her to prison.  It's just the facts of the case.  And it's a tough one.

I think that the issue of transgender -- treatment of transgender defendants in the criminal justice system is still a tough one.

Now, again, the theme of, "The arc of the moral universe bends towards justice," is exemplified by the fact that the Bureau of Prisons has established this enlightened task force.  But, two things:  One, there are other issues with placing transgender women, who still have male genitalia, into women's prisons.  We've had allegations of women claiming they were raped by transgender women, who still had the package.  We've had allegations that women in the prison demanded sex from a transgender person, or they were going to be beaten up, or whatever.  So it's tough, no matter how you slice it.  No matter how you look at it, it's tough.

And the time that a transgender person serves in prison is going to be difficult, for sure, under any circumstances.

We also don't know what might happen in 2024, if there's a change in administration, and a change in philosophy.  And the person who becomes in charge has more of the older attitude that these people should just get over it, and be the gender they were born with.  And if not, they're all depraved, and should be ignored.  We just don't know.

As Dr. King said, "The arc of the universe is long."  Sometimes it's two steps forward, one step back; sometimes it's two steps back, one step forward.

But dealing with Paige Thompson, what she did, who she is, is the dilemma before the court today.

And Officer Whaley and the Department of Probation took a

very careful look at this, and said two years in prison is the right sentence. And that, too, is a very reasonable position.

Mr. Hamoudi and Ms. Thompson are arguing for credit for time served, and supervised release with conditions. And, you know, that is also a reasonable position to take.

Ms. Whaley did do me the favor of coming up with a potential alternate approach. And that's the one that I'm going to take.

I'm going to impose, on Count 1, a sentence of time served, because probation is not available for Count 1. But on the other counts I'm going to impose a five-year term of probation. And in that five-year term of probation, Ms. Thompson will be on home detention for three years, 36 months. And it will be -- with home detention, it's more of a location monitoring than home incarceration, which is a real lockdown kind of thing.

And the conditions of probation will be as set forth in Ms. Whaley's original plan. I'm not imposing supervised release on Count 1. I'm imposing just the probation on the remaining counts.

And those conditions of supervised release are as follows: Ms. Thompson shall allow the probation officer to inspect any of her personal computers that she owns or operates. She shall comply with the requirements of the U.S. Probation and

Pretrial Services computer monitoring program, as directed by her probation officer.  She shall consent to the office conducting ongoing monitoring of her computer hardware and software, and all and any of her electronic devices and media.

The monitoring will include the installation, at the defendant's expense, of hardware or software systems that allow evaluation of the use.  Monitoring may also include the retrieval and copying of all data, and all -- from all computers and electronic devices.

Ms. Thompson will also be subject to quarterly polygraph testing, at her expense, solely to ensure compliance with the requirements of the monitoring program.

Ms. Thompson shall notify probation of all and any computer software she owns or operates, at the beginning of supervision, and any that she purchases, acquires, or uses during probation.

Ms. Thompson shall provide the probation officer with access to any requested financial information, including the authorization to conduct credit checks and obtain copies of tax returns.

Ms. Thompson shall disclose all her assets and liabilities to probation, and not transfer, sell, give away, or otherwise convey any asset, without first consulting with probation.

If Ms. Thompson maintains an interest in any business or

enterprise, she shall make all those records and documents available to probation.

Ms. Thompson shall maintain one single checking account, and use that for all deposits and withdrawals.  Ms. Thompson shall participate, as directed, in a mental health program approved by probation, and she must not incur new credit charges or open additional lines of credits or loans, without prior approval.  We will set a restitution hearing in the future to allow the defense to look at this.

How much time do you need, Mr. Hamoudi?

MR. HAMOUDI:  To look at -- I'm sorry, Your Honor.

THE COURT:  To set a restitution hearing down the line.  Do you want to do it in November, December?

MR. HAMOUDI:  Yeah, November.  Just to talk to her. And then we may file something before hand and vacate the actual hearing, Your Honor.

THE COURT:  Okay.  How about the 29th or 30th of November, do we have something in there?

THE CLERK:  December 1st would be available, Your Honor.

THE COURT:  November 1st [sic], let's set it there, 9 o'clock.

THE CLERK:  December 1st at 9 o'clock.

THE COURT:  Then shall we also make that the forfeiture issue to resolve, too?

MR. HAMOUDI:  Yes, Your Honor.

THE COURT:  But I'm finding, in the judgment, that forfeiture is appropriate.  It's just a question of how much and which items.

Then, finally, Ms. Thompson shall submit her person, property, house, residence, storage unit, vehicle, papers, computers, and other electronic data storage devices to search conducted by U.S. Probation or law enforcement, at a reasonable time and manner, based upon reasonable suspicion of contraband, or evidence of a violation of condition of supervision.  Failure to submit to search may be grounds for revocation of probation.

All right.  And I also would like Ms. Thompson to do community service hours.  There are a lot of nonprofit agencies or schools that could use her advice in this area.  And I think it would be good for her to do that.

So I'm going to make a requirement of 50 hours a year, for the five years of probation, that she do the community service in a placement that's approved by probation.

You understand what I want, Ms. Whaley?  Great.  Okay.  Thank you.

Then I'm going to waive a fine, for inability to pay.  There is a $50 -- $100 per count special assessment, for a total of, is it $700 -- seven counts -- that's due immediately.

MR. FRIEDMAN:  Two of the counts were misdemeanor counts, I believe, so they're only $25.

THE COURT:  Okay.  Yeah.  Whatever that is, Ms. Whaley, put that in there.  So it's $550, or -- yeah.  Okay.

And as I indicated at the beginning, this is my sentencing.  Ten judges might come up with ten different sentences, in this situation.  Some of them would have been seven years in prison.  Some of them might have been two years in prison.  Maybe one of them might have been credit for time served.

But I heard this trial.  I heard the testimony.  I've seen Ms. Thompson evolving, over the three years since we started. I believe the Autism Spectrum Disorder determination also makes sense, for some of her behavior, along with the ADHD, and the trauma that she suffered as a child, and suffered into her teens and young adulthood.

But I'm also confident to put my reputation on the line and say, I do not believe Paige Thompson will reoffend.  And if that does happen, she'll be in violation of her probation, and I'll deal with it, and I'll admit my mistake.  But I believe in her, and I believe that she will prove that this was the right sentence, going forward.

Now, Ms. Thompson, you have a right to appeal the verdict of guilty and the sentence that I'm imposing here today.  And I'm sure Mr. Hamoudi will explain those rights to you.  Do

you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  And, Mr. Hamoudi, I have no problem you appealing the legal issues here.  It's not like this sentence is only dependent on you not appealing or anything like that.  You do what you need to do, and Ms. Thompson will do what she needs to do.  And I appreciate your acknowledging that this is one of those rare times when a person's involvement in the criminal justice system may have actually saved their life.  So that's all good.

Mr. Friedman, do you want to say something.

MR. FRIEDMAN:  I have a couple questions, Your Honor.

THE COURT:  Sure.

MR. FRIEDMAN:  First off, I believe the maximum term of probation on the misdemeanor counts is one year.  So I assume it's five years on the felonies and one year on the misdemeanor?

THE COURT:  Correct.  Right.

MR. FRIEDMAN:  And Count 1 is time served with no supervision to follow?

THE COURT:  Yes.  No supervision.

MR. FRIEDMAN:  Okay.  And then as far as the terms of confinement, if you will help us with the language.

THE COURT:  Yeah.  Why don't you talk to Ms. Whaley and get that straight.  Take your time.  You can do it right

now.

THE PROBATION OFFICER:  Your Honor, could I confirm you'd like the radio frequency technology, as opposed to the GPS?

THE COURT:  Yes.

All the motions to seal are granted in regards to all the documents for sentencing.

THE CLERK:  And the overlength brief motion?

THE COURT:  Yes.  And all the motions for overlength briefing.  Thank you.

Could I ask for a show of hands of the Paige Thompson friends and supporters out there?  I'm not going to deputize you as U.S. Probation Officers, but you probably will see -- if there's a problem, you'll see it before they do.  So please understand that our goal here is not to find Ms. Thompson has done something wrong and send her to prison, but to keep her on the path she's on.  So for that degree, please work with us to keep her on the path.

Thank you.

MR. HAMOUDI:  We've reviewed the proposed judgment and it reflects the court's order.

THE COURT:  You can approach, Ms. Whaley, and give it to Victoria.  And she will hand it up.  Thank you.

All right.  I've signed the judgment in the case. Ms. Thompson, tonight and tomorrow in the Jewish religion is

day of atonement.  Jews don't go to confession like the catholics do all the time, they do it once a year; more efficient.

But think about what you have to atone for, and what you've achieved.  And I think the process of reconciling what you did, with who you are, and what you can be, you're well on that path.  Stay on that path.  And I would love to hear about how you started your own company, or you're working for this or that.  It would make me so happy and so proud for you.  Okay?

THE DEFENDANT:  Thank you, Your Honor.

THE COURT:  All right.  Thanks very much.  We are adjourned.

(Adjourned.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Debbie Zurn*

DEBBIE ZURN
COURT REPORTER