UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

UNITED STATES OF AMERICA,        )
                                 ) CASE NO. CR19-00159-RSL
              Plaintiff,         )
                                 ) Seattle, Washington
v.                               )
                                 ) October 26, 2023
PAIGE A. THOMPSON,               ) 10:30 a.m.
                                 )
              Defendant.         ) STATUS HEARING
                                 )
                                 )

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT S. LASNIK
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:


 For the Plaintiff:        JESSICA M. MANCA
                           TANIA CULBERTSON
                           United States Attorney's Office
                           700 Stewart Street, Suite 5220
                           Seattle, WA 98101


 For the Defendant:        GREGORY MURPHY
                           Federal Public Defender's Office
                           1601 5th Avenue, Suite 700
                           Seattle, WA 98101


 Reported by:              NANCY L. BAUER, CCR, RPR
                           Federal Court Reporter
                           700 Stewart Street, Suite 17205
                           Seattle, WA 98101
                           nancy_bauer@wawd.uscourts.gov

PROCEEDINGS

THE CLERK:  We are here in the matter of the United States versus Paige Thompson, Cause No. CR19-159, assigned to this court.

Counsel, please make your appearances for the record.

MS. MANCA:  Good morning, Your Honor.  Jessica Manca and Tania Culbertson on behalf of the United States, and Nicole Speckles is with us at counsel table on behalf of Probation.

THE COURT:  Hi, Ms. Manca, Ms. Culbertson, and Officer Speckles.

MR. MURPHY:  Good morning, Your Honor.  Greg Murphy from the Federal Public Defender's Office for Ms. Thompson, who is before the court.

THE COURT:  Everyone knows where we are.  There are some violations of probation, and we're trying to get to the what-do-we-next category of things.  And the violations are not contested, but I'm not going to send Ms. Thompson to jail or do any serious sanction.  So let's just talk what we should do going forward.

Mr. Murphy, how do you feel about just Ms. Thompson talk about her life and tell me what she's going through?

MR. MURPHY:  Your Honor, that was what I had proposed to Ms. Thompson beforehand, and I know -- I trust your judgment, but I think that would be an appropriate way to go.

THE COURT:  Yeah.  Okay.

Ms. Thompson?

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  Good morning.

THE DEFENDANT:  So I'm not really sure where to start.

THE COURT:  Well, I think we talked about mental health, we talked about community service, and we talked about computer monitoring.  Those are the three general areas that I put some restrictions on you.  You do X amount of community service, keep pursuing your mental health counseling, and participate in computer monitoring.  And then the fourth item was getting employed and move forward with your obvious talents and skills in some way.  So let's talk about all four of those things.

THE DEFENDANT:  Okay.

THE COURT:  How about employment?

THE DEFENDANT:  Well, I've worked most of my life to get better at computers, and it's really probably the only thing that's ever brought me any joy in life, to be honest with you.

THE COURT:  Boy, I feel exactly the opposite.  I'd have a lot more joy in my life if I didn't have to deal with computers.

THE DEFENDANT:  I wish I had more of an opportunity to improve them.  It's kind of take what I can get and when I can get it, and it's always kind of been that way.  But it's always

been a passion of mine and something I care a lot about.

And, yeah, I've -- you know, I've certainly always wanted to make an honest living.  And it's -- you know, I don't know what else I'd rather be doing, to be honest with you.

THE COURT:  So when you see jobs out there and you say, "I could do that, and that would make me happy if I could do that," what happens next?  Do you apply for them and not get them, or do you not apply for them because you don't want to go through the rejection situation?

THE DEFENDANT:  It's very competitive, and, yeah, it does take a lot of applying for them.  A lot of people will do what I was doing, which was going through Upwork to build up some recent experience.  A lot of employers want to see most recent experience, and they look specifically at that.  And it's difficult to get experience when you've been out of work for a while.  And so doing, you know, something like small contracts and telecommute work is one way to get back to a full-time job in tech.  But it is also very competitive.  I'd say, yeah, like, you know, you apply for hundreds of jobs and may only get one interview out of it, so...

THE COURT:  But have you had that experience of having an interview?

THE DEFENDANT:  Yes.  You mean recently?

THE COURT:  Yes.

THE DEFENDANT:  I have not interviewed recently.

THE COURT:  Okay.  Have you gotten to a point where, Oh, my God, we can't hire you, Paige Thompson?

THE DEFENDANT:  Oh, actually, I have had a couple of interviews.  Yeah, there was one like that.  And I don't withhold information from people.  I've been very forthcoming about what's going on in my life and what's happened.  Yeah, a lot of people, you know, are really afraid of that.

I did have some ongoing interviews with Google, for a minute, but then they went through a hiring freeze.  And, yeah, so my interview got put off -- my next interview with them got put off.

THE COURT:  But you went through one round with Google?

THE DEFENDANT:  Yeah.  I went through a -- they offered me a refresher interview, which is something where -- it's, like, a practice interview.  And it was -- yeah, I think I did pretty well on that.

THE COURT:  Okay.

THE DEFENDANT:  So, yeah, I was planning on actually doing a real tech interview with them, where you, basically, have to write code on a board.  It's pretty stressful for some people, but, you know.

THE COURT:  Yeah.  The tech industry hasn't been booming lately, that's for sure, yeah, a lot of downsizing.

Let's talk about mental health.  For a while, you were very

committed to doing mental health counseling and dealing with issues.  It seems like you've gotten away from that.

THE DEFENDANT:  No, actually, to the contrary.  I just spoke with my counselor on Monday, and I've been seeing my psychiatrist, too.  Yeah.  No, it's, like -- I think my old counselor, like, their -- the Seattle Counseling Service closed down up on Capitol Hill, and some mental health doesn't have the same kind of resources, really.  It's kind of hit and miss.

I do have a counselor.  Her name is Jordan, I have been seeing here.  So it's an ongoing thing.

THE COURT:  In person or online?

THE DEFENDANT:  In person but also on the telephone.

THE COURT:  Good.

THE DEFENDANT:  We most recently met by telephone.  And, yeah, you know, I do meet her in person sometimes.  It's just -- yeah, it's easier because then I don't have to schedule time to leave the house, and I can just do it by phone.

THE COURT:  And tell me about the community service hours.  You were working -- I mean, doing them at a particular place.  Did you enjoy doing it?

THE DEFENDANT:  Yeah.  Absolutely.  Yeah.  I loved doing it, and, actually, if you wanted to give me more community service hours, that would be good for me, honestly.  Because these are, like, things, like -- in my mind, it would be cool to go volunteer for the park, and it's, like, I just never -- I

never would unless I absolutely, like, had to, or unless the opportunity was just really convenient, for some reason.

And I, actually, enjoy getting out there and working, and it's been a lot of fun.  And it's -- I -- you know, I think it's healthy, too.

THE COURT:  But it seemed to me that you did four hours when I asked for five, and you were, like, Nah, I'm not going to do the fifth one.

THE DEFENDANT:  Did I?

THE COURT:  Officer Speckles, wasn't that one of them?

THE PROBATION OFFICER:  Yes, that's correct. Previously, when we've been before the court, she hasn't completed the minimum of the five hours a month.

THE COURT:  Yeah.

THE PROBATION OFFICER:  And in multiple statements to me on multiple occasions, she has said to me that she does not want to do community service, she doesn't feel like doing it, she just has no interest in doing it.

THE COURT:  And that's what I'm having a hard time reconciling.  I'm hearing one thing from Probation about mental health and about community service hours and seeking employment, and you're telling me something that's a little bit different. So where's the disconnect?

THE DEFENDANT:  I guess I could get somebody from the park that I've worked with to support me on wanting to be there,

because I don't -- I, honestly, don't remember saying that. Maybe I did, but I -- yeah, that's -- that hasn't been my prerogative.

THE COURT:  Well, what --

THE DEFENDANT:  If it needs to be -- if it has to be five hours, that's fine.  I don't have anything against doing five hours.

THE COURT:  Why don't you do the five hours a month, and, you know, just have, like, a piece of paper from your supervisor that says, you know, Paige Thompson worked five hours in the month of November at this park, and signed.  That's all we're asking for.

THE DEFENDANT:  Yeah, absolutely.

No, and I've, actually, some cases, I've done more than five hours.

THE COURT:  That's fine, too.  Just get the actual number of hours.  You can carry some over.  If you do 10 hours one month, I'd let that extra five go to the next month.

But you've always been totally respectful to me, Ms. Thompson, in the courtroom, and when I read some of the interaction with Probation, I'm having a hard time reconciling that person who is being, you know, sort of dismissive of Probation and what Probation is asking, with the person I see in the courtroom, who is respectful and wants to do the right thing.

So, obviously, there's stuff going on in your life, and I don't expect you to always have, "What does Judge Lasnik want me to do" at the top of your list of important things, but, really, we're not asking that much, are we?

THE DEFENDANT:  I don't think so.  I've, actually -- in fact, I think that if it wasn't, like, for the home-restriction stuff, I probably would have been done with my community service by now.  That's really the only thing that's, like, really kind of held me back, is just when can I schedule -- you know, I guess I have, kind of, anxiety about wanting to call for time or schedule time sometimes.  And really, I -- I kinda wish I could just have my life back, to some extent.  But I have no objections to doing community service.  And it's -- yeah, it's absolutely fine with me.

THE COURT:  Okay.

And, Officer Speckles, have you been asking Ms. Thompson to advise you of when she applies for jobs and where she applies for jobs?  Has that come up?

THE PROBATION OFFICER:  Yes, Your Honor.  In terms of employment, the established protocol has always been per her conditions.  Whatever job she would like to apply for, if she has interest in it, she needed to have communicated that with the probation office to make sure that whatever the job is is not going to put her in violation.

So the process would be, she would reach out, and she would

say, Hey, I'm looking at wanting to apply for these jobs.  Is this okay?  Is this appropriate?

We would evaluate it, and then I would provide her with an answer.  That conversation has never occurred.  I'm only ever finding out about the jobs she has applied for when we've been in this courtroom.

THE COURT:  Okay.  And in terms of mental health, were you surprised to hear Ms. Thompson talk about what she's done here today?

THE PROBATION OFFICER:  I'm not entirely surprised.  In multiple conversations with her over the course of supervision in post-conviction, she has stated in the courtroom that she is attending mental health, but I have had an extremely difficult time being able to verify that.  I've reached out to Sound on numerous occasions; have never heard -- received a phone call back or an email.

In fact, I met with Ms. Thompson during a home inspection on the 17th this month, and I asked her again, specifically, about mental health, if she's attending, what that looks like.  She did say that she had an appointment in September; she has an appointment coming up in November.  I asked her if she would be willing to call her provider, because I had had difficulty getting ahold of them to verify participation for this hearing today, and she agreed that she would, and I have still not heard anything from Ms. Thompson, from her provider, to able to

support and verify what she is saying, that she is going.

THE COURT:  And when Ms. Thompson talks about restrictions, you know, where she's not allowed out of the house or -- what are those restrictions now?

THE PROBATION OFFICER:  So that is more under the umbrella of the location monitoring.

THE COURT:  Right.

THE PROBATION OFFICER:  It isn't that Ms. Thompson isn't allowed to go anywhere.  But because she is confined to her home, she has to put in requests in a timely manner with her officer who oversees that.

THE COURT:  And that's a different person than you?

THE PROBATION OFFICER:  Correct.  That is Officer Tenisha Gilbert with whom Ms. Thompson has been working, and I also work close with her as well.

THE COURT:  Sure.

THE PROBATION OFFICER:  When Ms. Thompson has requested permission to leave the district, such as to go to Nevada for a technology conference networking, Tenisha has reached out to me so we can staff the request as a team effort.

THE COURT:  Okay.

THE PROBATION OFFICER:  But it is up to Ms. Thompson to make sure, if she would like to go somewhere, to an appointment or what have you, that she submit those requests in a timely manner to her LM officer.

THE COURT:  And "timely" means how much notice?

THE PROBATION OFFICER:  It's my understanding that it's a minimum of two days in advance.  And if it's not within that time frame, if it's one day or the day of, that, unless it's a medical emergency or a court hearing, it won't be approved because the specified timeline was not followed as part of the program.

THE COURT:  Okay.  All right.

And, Ms. Thompson, does that kind of thing present difficulties for you?  I know that, you know, you talk about being somewhere on the spectrum.  You're not autistic.  Believe me, you have great social skills.  But spontaneity or having to clear things, is that a problem for you?

THE DEFENDANT:  It depends on the day.  Some days are better than others.

I did talk to Jordan, and she said that they do have a release of information for the Probation Office.  I suppose you would just need to reach out to Jordan Carlson.  I, honestly, wouldn't know.

But as far as -- yeah, just -- just reaching out, sometimes, like -- it's just not easy, I would say.  I think -- did I answer your question?

THE COURT:  Yeah.

No, I mean, you say you want to do the community service hours, but it's difficult for you to comply with location

monitoring and do it two days in advance because that's just hard for you.  So I'm looking at what can I do to make it easier for you.

THE DEFENDANT:  Well, I'm not sure.  I would say I think -- I'm not really sure how many hours I have left, that I have to complete.

THE COURT:  What did we say?  Fifty hours a year for five years is what I said.

THE PROBATION OFFICER:  That's correct.

THE COURT:  And five hours a month was what we were looking for; is that right?

THE PROBATION OFFICER:  That's correct.

THE COURT:  So you still have a lot of hours to do, but that's what I said at the sentencing.

THE DEFENDANT:  If I complete more than 50 hours in a year --

THE COURT:  Sure, we could count those, yeah.

THE DEFENDANT:  Okay.

THE COURT:  But let's do the minimum five hours a month to start with, and then if you get to ten a month and so on and so forth, that's great.  And you say you like to do it, so that's great.

So all I need you to do within the location monitoring is give Tenisha two days' notice.  You can look at your app and see what the weather is going to be like two days in advance.

You know, err on the side of asking for it, and if, for some reason, you can't go, you're not going to be punished for not going, but you can't wait until, "Oh, it's a nice day in Seattle.  I think I'll go do community service."  That's just not possible right now.

So can't you give a couple of days' notice?

THE DEFENDANT:  Yeah, that would be fine.

THE COURT:  Okay.

THE DEFENDANT:  I have so far.

THE COURT:  Okay.  How do you get along with Officer Speckles?  You can be totally candid.  Not every lawyer matches well with a client.  Not every officer matches well with a client.  Do you have problems communicating with her?

THE DEFENDANT:  Not really.  I just don't really, you know -- I don't really know what to say to her.  I -- I just want to -- honestly, I just want to complete my community service and get on with my life.

I -- I haven't -- I just don't really know, like, what I need to do, honestly.

THE COURT:  Mr. Murphy?

MR. MURPHY:  Thank you, Your Honor.

I read, in Officer Speckles' memorandum, that it sounds as if Ms. Thompson will be assigned to a different officer.

I, of course, was not here during the trial, but it's my understanding that Ms. Thompson worked well with Officer

Beetham, with whom she was on pretrial supervision during that time. He's now doing post-conviction supervision. I have no idea whether he'd be willing or available, but I do know that they had a productive relationship. So to the extent he is available, I would hope that Probation would, at least, consider that possibility.

THE COURT: This is Ben Beetham we're talking about? Is he doing that job now?

THE PROBATION OFFICER: It is Ben Beetham we are talking about. He's supervising in Pretrial. He's the pretrial intensive supervision specialist. Ms. Thompson would be transferred to our post-conviction specialist, Darcell Prescott. It is, unfortunately, not possible for Ms. Thompson to be supervised by Officer Beetham at this time.

MR. MURPHY: Fair enough, Your Honor. I've had good relations with Ms. Prescott, also, so I hope that it will be --

THE COURT: Yeah. Let's try it with Darcell Prescott. I mean, Ben Beetham is a great guy, no question about it, and I was very grateful he was assigned to Ms. Thompson early on. And Darcell Prescott, also an excellent person. Nicole Speckles is an excellent person, but sometimes you need a change of pace. So let's wait and see how that goes.

Ms. Thompson, when you apply for jobs, run it by Probation. Okay? Yeah.

And keep doing the psychiatric counseling and the mental

health counseling.

And as far as computer monitoring goes, Officer Speckles, has that been a problem?

THE PROBATION OFFICER:  Yes, Your Honor.  As I stated, the last time we were in this courtroom, the entire time that Ms. Thompson has been on post-conviction supervision, she has verbalized to me that she is not able to afford the monitoring software.  And as her conditions on her judgment state, in order for her to be approved for access to the Internet, using any electronic devices capable of accessing the Internet, she needs to have some type of monitoring software because of her instant offense.

The entire time that she has been on supervision -- and we've had numerous conversations about monitoring -- she, every time, has verbalized she is not able to pay.

So for these reasons, she's not approved to access the Internet, which is one of the violations we are here on, because she has taken it upon herself to decide that that's the only way she can apply for jobs, and the jobs she's applying for are computer and web-based and technology jobs.  So that has been an ongoing issue, because she's not been approved to be on the Internet, and she has been for some time.

THE COURT:  Well, it would be a little bit surprising if you were applying for a job in computer to apply with a letter in 2023, no question about that.

So, Ms. Thompson -- how much is the computer monitoring software?

THE PROBATION OFFICER:  The monitoring software is $40 a month.

THE COURT:  $40 a month?

THE PROBATION OFFICER:  Uh-huh.

THE COURT:  Okay.

Do we have the capacity to provide it for free under certain circumstances?

THE PROBATION OFFICER:  We may have some ability to help out in that area financially.  We would be in need of financial documents from Ms. Thompson about what her finances look like.  We take a look at those, and then determine how much it is that we are able to pay on our end.

So it is a possibility.  It would just be she would need to do an assessment with us.

THE COURT:  Well, Ms. Thompson has to have computer access.  I mean, that's part of who she is and that's part of how she'll get a job.

So, Ms. Thompson, $40 a month, you can't come up with that?

THE DEFENDANT:  I don't think so, unless I could borrow it from somebody.

My only issue with that was that I don't -- I don't understand.  What is computer monitoring anyway?  Would they be able to tell, like, if I were doing programming exercises to,

you know, practice for interviews?  Would they be able to make the distinction between that and I'm doing something illegal?

And I don't -- I don't have any objection to it, I guess, but it's, you know, people who communicate with me also don't necessarily know that the government is specifically monitoring my device.  And I don't anticipate that I'm going to have any communications with anybody that's, you know, going to be a problem, but I think it's a privacy issue for some people.

THE COURT:  I'm just not that familiar with what computer monitoring actually means, in terms of do they know who Ms. Thompson is communicating with, do they know what it's about?  What, kind of, shows up?

THE PROBATION OFFICER:  Absolutely.  So the program is installed on, let's say for example, for her smart phone, and it is run through a company RemoteCom.  We also contract with a different company, IVPC.  The software -- there is an appointment that's scheduled to download the software onto the electronic device, and then what we're able to see is all of her movements, whether it's on the Internet, we're able to access her communication.  It records snapshots.  Physically, we can go and see what she's looking at at a specific time of day; what her cell phone screen is like.  We can look at her Internet search history.  We can look at and see what she's looking at and searching in the search engines.  Essentially, we can view everything that she is doing on her phone with this monitoring

software, and we will be able to distinguish whether it's something that we've approved, such as for employment, or if it's something that we have not approved, and that would be with communication between Ms. Thompson and the Probation office about what that looks like, what she's actively been approved for and what she hasn't been.

THE COURT:  Thanks.

Mr. Murphy, what do you think about the computer monitoring thing?  How can we make that work?

MR. MURPHY:  Your Honor, it's very hard for me to imagine a scenario in which that kind of extremely intensive monitoring would be satisfactory to any employer, any -- or to most people in Ms. Thompson's community, as she's described.

I certainly understand, given the nature of the conviction, why it was ordered.  And it seems like it would have been an appropriate consideration and a thing to address.  But it does seem like a handicap now that it's hard -- would be very hard to overcome.

If the court would be comfortable removing it, I think that would be the only way to fix it.

THE COURT:  Yeah.  I mean, what makes this so tough, Mr. Murphy, is the alternative to the five years of probation was a prison sentence, where, you know, Ms. Thompson would not be worried about four versus five hours of community service, or computer monitoring versus you don't get to have any access.

And, again, I'm not saying I want to send her to prison to show her the difference, but I need more cooperation from her now before I can start pulling things off, if you will.

And so I'm not going to change the computer monitoring. I'm not changing the hours.  I'm not going to change the conditions of probation.  But I need Ms. Thompson to prove to me that she can comply, and if she complies, then I can say, Okay, I can trust you, you're doing what I asked you to do, you did what you said you would do, and then I can start pulling things off.  Do you see where I'm coming from?

Okay.  I'm not going to put any additional sanctions on today.  I'm not changing the conditions.  I find that the violations did occur, by a preponderance of the evidence, but we will hope for better results.

When does Officer Prescott transition onto the case?

THE PROBATION OFFICER:  Your Honor, that would be as soon as the conclusion of this hearing, she would be moved.

THE COURT:  All right.

So we'll have another hearing -- let's do sometime in January or February, and we'll see where we are.  Okay?  Does that sound reasonable?

All right.  Thanks, counsel.  Thanks, Ms. Thompson, Officer Speckles.  We're adjourned.

(Proceedings concluded at 11:06 a.m.)

C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 14th day of November 2023.


/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter