```
                    UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

UNITED STATES OF AMERICA,        )
                                 ) CASE NO. CR19-00159-RSL
               Plaintiff,        )
                                 ) Seattle, Washington
v.                               )
                                 ) February 8, 2024
PAIGE A. THOMPSON,               ) 10:30 a.m.
                                 )
               Defendant.        ) STATUS HEARING
                                 )
_____

                    VERBATIM REPORT OF PROCEEDINGS
                BEFORE THE HONORABLE ROBERT S. LASNIK
                     UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:


  For the Plaintiff:      ANDREW FRIEDMAN
                          TONIA CULBERTSON
                          United States Attorney's Office
                          700 Stewart Street, Suite 5220
                          Seattle, WA 98101



  For the Defendant:      GREGORY MURPHY
                          Federal Public Defender's Office
                          1601 5th Avenue, Suite 700
                          Seattle, WA 98101



  Reported by:            NANCY L. BAUER, CCR, RPR
                          Federal Court Reporter
                          700 Stewart Street, Suite 17205
                          Seattle, WA 98101
                          nancy_bauer@wawd.uscourts.gov
```

|   |   |
|---|---|
| 1 | PROCEEDINGS |

3      THE CLERK:  We are here in the matter of the United States versus Paige Thompson, Cause No. CR19-159, assigned to this court.

Counsel, please make your appearances for the record.

MR. FRIEDMAN:  Good morning, Your Honor.  Andrew Friedman and Tonia Culbertson for the United States, and with us at counsel table is United States Probation Officer Darcell Prescott.

THE COURT:  Hi, Mr. Friedman, Ms. Culbertson, and Ms. Prescott.

MR. MURPHY:  Good morning, Your Honor.  Greg Murphy with the Federal Public Defender's Office here with Ms. Paige Thompson.

THE COURT:  Hi, Ms. Thompson and Mr. Murphy.

We're here for, sort of, a status conference, an update, and let me start with Officer Prescott and, kind of, see where we are in terms of what we've asked Ms. Thompson to do and what she's actually done.

THE PROBATION OFFICER:  Good morning, Your Honor.

THE COURT:  Good morning.

THE PROBATION OFFICER:  A couple of things happened since the revocation hearing.

She was transferred to my caseload from her previous

1   probation officer.
2       A couple of positive things is her mental health treatment.
3   She is seeing her prescriber. Unfortunately, in November, I
4   talked to her mental health counselor. She was in attendance,
5   she was, you know, meeting with her prescriber every three
6   months. Unfortunately, her mental health provider -- her
7   counselor quit, and now she's waiting to be assigned a new
8   counselor.
9       Another thing we did was we modified her conditions of
10  supervision so that she could do more community service hours.
11  Because the way it was written in the judgment, it was capped at
12  50 hours a year, and so it was difficult. Because she is on
13  location monitoring, home detention, they couldn't let her go do
14  additional hours without it being approved, and then the
15  judgment.
16      So then on that front, she hasn't really been able to do
17  extra hours yet, because the place where she goes changed hands,
18  the volunteer coordinator. So I did talk to the previous
19  volunteer coordinator, and now there is a new volunteer
20  coordinator, and now Paige has to contact her and get back on
21  the schedule. But they told me -- her exact words were, "We
22  love Paige, and we want Paige to come and volunteer. We just
23  need to coordinate and figure out what hours she can come."
24          THE COURT: Okay.
25          THE PROBATION OFFICER: So the things that haven't

1  really changed, Paige is still unemployed.  And I haven't --
2  from what she's telling me, she's not looking for employment.
3  She doesn't want to work at, like, a minimum-wage job, given her
4  past employment history.
5       And she's not made a restitution payment; however, some
6  friends of hers raised money through a GoFundMe account, $300 to
7  be exact, so that she could make $5 monthly payments for the
8  duration of her probation.  She has not made a payment yet, and
9  I think she's got to figure out the details on how you get the
10 money from the GoFundMe account into, like, her bank account,
11 and I'm not entirely sure how that works.
12      So I think that's, I would say, an update on Paige.
13      I talked to the location monitoring person that does the
14 scheduling, and she doesn't request a lot of passes.  Most of
15 her passes are for medical appointments, her mental health
16 appointments, or they were for community service.
17           THE COURT:  Okay.  And have you had an opportunity to
18 establish, kind of, an officer/supervisee relationship with
19 Ms. Thompson?
20           THE PROBATION OFFICER:  Yeah, I think so.  I met with
21 her once at her residence, but we do talk regularly via text
22 message or on the phone.  We communicate about what's going on.
23           THE COURT:  Okay.  And you and I had a conversation
24 about maybe having Ms. Thompson keep a diary.
25           THE PROBATION OFFICER:  Yes.  I spoke to her the

1  following day and asked her to start journaling her daily
2  activities and her goals for this year.  She said she would do
3  that, and I believe that she has.
4              THE COURT:  Great.  Thanks very much, Officer
5  Prescott.
6              THE PROBATION OFFICER:  You're welcome.
7              THE COURT:  Mr. Friedman, is there anything you want
8  to say, or are you just watching?
9              MR. FRIEDMAN:  Largely watching, Your Honor.  There's
10 nothing pending before the court.
11             THE COURT:  Let me know if you want to say something,
12 and I'll tell you, no, you can't.
13       All right.  Mr. Murphy?
14             MR. MURPHY:  Similarly.  I have impressions, but no
15 real expertise.  I'm happy to share those, but I know the court
16 wants to hear, primarily, from my client.
17             THE COURT:  Yes.  Ms. Thompson?
18             THE DEFENDANT:  Where should I start?  Can everybody
19 hear me?
20             THE COURT:  Yes.
21             MR. MURPHY:  Your Honor, maybe I will share some
22 impressions.  It'll give Ms. Thompson something to disagree
23 with.
24             THE COURT:  Sure.
25             MR. MURPHY:  So let me first say that I think there

1  are a handful of things that have dramatically improved since
2  the last time I was here before Your Honor.
3       I think Officer Prescott is a good choice for Ms. Thompson,
4  and for reasons that have nothing to do with the quality to
5  their -- her professional abilities are better than her prior
6  probation officer.
7       I think Ms. Thompson seems to be in a better place
8  emotionally, feels less attacked than the last time we were here
9  on a revocation hearing.
10       Those are just my impressions, and as I say, she may well
11  disagree with those.
12       I think my impression, also, is that Ms. Thompson, as the
13  court knows, the court imposed a long period of home detention.
14  And she was convicted and has -- you know, so she has a felony
15  conviction, a huge amount of restitution, beyond what any one of
16  us could ever pay, and home detention.  And I think the
17  cumulative effect of those has been somewhat demoralizing, I
18  think.
19       And so you're welcome to read her journals, which she did
20  bring them, but, as I review them, I don't see a lot of
21  optimism, except, perhaps, around her cat.  And I know that, you
22  know, she's said things like, you know, she has to go get her
23  medication, her home medication, for example, but has been too
24  discouraged to ask for a pass to go to the pharmacy.  And to do
25  that, which I'm sure -- you know, probation, obviously, would

1  grant that, but not wanting to, sort of, go out and to do basic,
2  sort of, care-for-self kind of things is the kind of things I've
3  seen and gives me some reason to worry.
4       So I know -- I think this volunteer work has been great.  I
5  know that they appreciate her.  I know that she appreciates, you
6  know, being outside and being productive and being helpful.
7       I think it's unfortunate that, you know, a number of the
8  people who have been important for her have left; you know, Mo
9  Hamoudi, the mental health coordinator who was so appreciative
10 of her, the mental health counselor.  You know, it would be nice
11 if there was some continuity there, but, you know, it's not the
12 world we live in.
13      So those are my impressions, and I'll just set Ms. Thompson
14 up to disagree with me as she sees fit.
15           THE COURT:  Okay.
16           THE DEFENDANT:  I wanted to add that, as far as the
17 payment amounts, I talked to Maxine, and she said it would be
18 fine, if I needed to pay more than $5, the terms of that can be
19 renegotiated.
20           THE COURT:  Sure.
21           THE DEFENDANT:  Okay, just, yeah.
22           THE COURT:  So did I hear that right, the thing you're
23 most excited and optimistic about is your cat?
24           THE DEFENDANT:  Yes, I think so.
25           THE COURT:  My son, Andy, in Portland, just adopted a

1  cat, and that's all he can talk about is Roo the cat and how
2  much joy he's brought to him.  There's nothing wrong with that.
3  Cats can be more constantly loving than people can be.  No
4  question about that.
5              THE DEFENDANT:  I've had him -- we adopted him in
6  2021, November 2021, so I've had him for a while.  Yeah, I think
7  everybody in the house wants to pet him and pick him up and
8  stuff, but he's pretty much only loyal to me.
9              THE COURT:  What is the cat's name?
10             THE DEFENDANT:  Catman.
11             THE COURT:  Catman.  Okay.
12             THE WITNESS:  It just sort of stuck.  I don't know
13 why.
14             THE COURT:  And, you know, Ms. Thompson, you see
15 layoffs happening in the tech industry now in pretty phenomenal
16 numbers.  It's not an easy profession to get into, even if you
17 don't have a criminal conviction and past like you do; that
18 would make people kind of hesitant.
19        Do you see yourself employed in some way besides using
20 tech?
21             THE DEFENDANT:  I do.  I think it would be a lot
22 easier for me if I were doing it for myself.  I feel like having
23 it as an obligation has added a little bit of stress to it.
24 It's kind of, I guess -- I guess, I do have some problems with
25 anxiety, so I don't really know how to explain that, but anxiety

1  sucks.
2         THE COURT:  Yeah, and you're not alone.  Especially
3  during the pandemic, a lot of people have been crippled by
4  anxiety in one way or the other.
5      How are you doing with Darcell?
6         THE DEFENDANT:  She's fine, actually, I think so.
7         THE COURT:  That's what she's told me, yeah.
8         THE DEFENDANT:  Yeah.  I -- I don't know.  What you
9  mentioned about the layoffs and the competitiveness of working
10 in tech, it is difficult, but it's -- yeah, I guess it's not --
11 it's not something that -- I mean, I don't have to work in a
12 tech job.  I don't -- I just -- I just -- I think it would be a
13 little easier for me if I were looking for myself and if I had a
14 little more freedom to go out and look around, I guess.  And --
15 I forgot what I was going to say.
16        THE COURT:  Are you open to working with Officer
17 Prescott, to look at maybe some other kinds of jobs?
18        THE DEFENDANT:  Yeah, that's a possibility.
19        THE COURT:  Yeah?  I think it would be good for you,
20 because, you know, tech is, A, so difficult now, and B, the
21 environment can be pretty cutthroat at some of these companies,
22 as you saw at Amazon.  Maybe a step to the side and doing
23 something that helps your soul more might be useful.
24        THE DEFENDANT:  Yeah.  That could be -- that -- I
25 think, ultimately, I -- I -- my passion has always been in

1  computers, and it's, like -- it's hard to imagine much else that
2  would bring me as much joy.  But, yeah, I'm open to doing a lot
3  of things, even just for short term.
4          THE COURT:  All right.  Well, I'm happy to hear from
5  you.  I think we should set it up for, maybe, sometime in May
6  that we do another one of these, and I think I'll let Officer
7  Prescott kind of tell me, yeah, this is a good time, and then
8  we'll schedule it going forward.  Okay?
9       All right.  Thank you.  We're adjourned.
10             (Proceedings concluded at 10:42 a.m.)

C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 22nd day of February 2024.

/S/   Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter